UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILDERNESS WATCH,<br><br>Plaintiff,<br><br>v.<br><br>Y. ROBERT IWAMOTO and UNITED STATES FOREST SERVICE,<br><br>Defendants. | CASE NO. C10-1797-JCC<br><br>ORDER ENTERING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF |

This matter comes before the Court on Plaintiff's motion for summary judgment and injunctive relief (Dkt. No. 19), Defendants' response and cross-motion for summary judgment (Dkt. No. 23), Plaintiff's response (Dkt. No. 40), and Defendants' reply (Dkt. No. 42). After a thorough review of the parties' briefing, the submissions of amicus curiae (Dkt. No. 29), and the relevant record, the Court finds oral argument unnecessary, and hereby GRANTS Plaintiff's motion for summary judgment and injunctive relief and DENIES Defendants' cross-motion for summary judgment for the reasons explained herein.

## I.     BACKGROUND

This case involves the question of whether the Green Mountain lookout, an extensively rehabilitated fire lookout originally built in the 1930s, must be removed from a federally-designated wilderness area in light of the Forest Service's purported violations of the 1964 Wilderness Act and the 1969 National Environmental Policy Act ("NEPA"). Below, the Court

1 sets out, in roughly chronological fashion, a history of the Green Mountain lookout and relevant
2 legislative events.

3      Starting in 1919, the summit of 6,500-foot Green Mountain was used as a lookout site for
4 detecting forest fires. (Administrative Record ("AR") 49, 93.) The summit of Green Mountain
5 allows for a 360 degree panoramic view over the Suiattle River Valley toward Glacier Peak to
6 the south and Mt. Baker and Mt. Shuksan to the north. The first lookouts camped in tents below
7 the summit of Green Mountain, but in 1933, a cabin was constructed at the summit. The
8 structure – perched on the northern edge of the mountain's rocky ridgetop – became known as
9 Green Mountain lookout. Although the principal use of the lookout was fire detection, it was
10 also used for a short while during World War II to detect enemy aircraft. At present, the lookout
11 is no longer used for fire or aircraft detection; however, it has become a frequent destination of
12 day hikers.

13      In the years since its construction, Green Mountain lookout has been subject to a series of
14 increasingly elaborate rehabilitation efforts, a principal purpose of which has been to keep the
15 lookout from slipping off the summit. The first major effort occurred in the early 1950s, after
16 heavy snowfall severely damaged the lookout, "twist[ing] the building apart." (AR 34, 135.)
17 Contractors were hired to carry out "extensive repair and reconstruction," which included
18 reconstruction of the roof, dismantlement and reconstruction of portions of the walls, and repair
19 and reinstallation of windows, shutters and the door. (AR 135.) While all possible timber was
20 salvaged for use in the new building, the roof was a "total loss," and "[n]ew rafters and other
21 materials had to be packed in from below." (AR 35.) The contractors did make efforts, however,
22 to reconstruct the roof "to match the original hipped roof" design. (AR 135.)

23      In the decades following the 1950s reconstruction of Green Mountain lookout, several
24 key pieces of legislation were enacted. One of these was the Wilderness Act of 1964, which
25 provided for the designation of federally-protected wilderness areas where land would "retain[]
26 its primeval character and influence, without permanent improvements or human habitation" and

1 where "the imprint of man's work [would be] substantially unnoticeable." Pub. L. 88-577, 78

2 Stat. 891, § 2(c) (Sept. 3, 1964). Another was the Washington State Wilderness Act of 1984,

3 Pub. L. 98-339, 98 Stat. 299 (July 3, 1984), pursuant to which Green Mountain lookout became

4 part of a federally designated wilderness area (the Glacier Peak Wilderness Area), and

5 accordingly, subject to the provisions of the Wilderness Act.

6 During this period, Congress also passed the National Historic Preservation Act

7 ("NHPA"), which was designed to promote preservation of historical and archeological sites in

8 the United States "for the inspiration and benefit of the people of the United States." Pub. L. 89-

9 665, 80 Stat. 915 (Oct. 15, 1966). The NHPA, among other things, created the National Register

10 of Historic Places ("National Register"). Pursuant to § 106 of the NHPA, federal agencies must

11 take into account the potential effect on National Register property when considering federal

12 action.

13 In 1977, the Forest Service and the State Historic Preservation Officer considered

14 whether the Green Mountain lookout qualified for listing on the National Register. The Forest

15 Service found that the lookout "does not appear to meet the National Register criteria . . . [t]he

16 building is associated with important historical events, but it's a reconstruction and is not the last

17 remaining survivor with such an association." (AR 36.) The State Historic Preservation Officer

18 concurred with this assessment, finding that the Green Mountain lookout "does not meet

19 National Register Criteria." (AR 32.) Following these determinations, the lookout was

20 maintained "only enough to keep it from collapsing and to make it relatively safe for the many

21 recreation visitors [using] the site." (AR 88.) In 1984, a major alteration to the original lookout

22 occurred when a catwalk and supports were added to stabilize the lookout. (AR 134.)

23 In 1985, a group named "Friends of Green Mountain" asked the Forest Service for

24 permission to assume responsibilities for maintaining and preserving the Green Mountain

25 lookout in light of its historical significance. (AR 85, 98, 103.) The Service responded that it

26 would conduct an environmental analysis of the group's proposal but called attention to the fact

1 that the 1984 wilderness designation of the lands encompassing Green Mountain had limited the
2 authority of the Forest Service and that the Wilderness Act might require that the lookout be
3 removed rather than maintained. (AR 86.) The Service also noted that Congress had not
4 specifically endorsed Green Mountain lookout for protection, as it had done for other structures.
5 (AR 86.) Contemporaneously, the Service sent a letter seeking guidance from the forest
6 archaeologist as to whether the lookout should be removed in consistency with the Forest
7 Service's 1977 assessment that the lookout did not qualify for the National Register of Historic
8 Places. (AR 88.) The letter noted that a decision to destroy the lookout or to deny permission to
9 maintain the lookout would be unpopular given the "recent rise in public appreciation for
10 lookouts in the Pacific Northwest." (AR 88.)

11     In 1986, in an apparent departure from its prior assessment of the historical status of the
12 lookout, the Forest Service nominated the Green Mountain lookout, along with 7 other lookouts
13 in the Mt. Baker-Snoqualmie National Forest, as a "thematic group" for listing on the National
14 Register. (AR 124, 126, 134-36.) In 1987, the National Park Service listed the lookouts on the
15 National Register. (AR 169.)

16     For much of the 1980s and early 1990s, the Friends of Green Mountain coordinated
17 seasonal volunteer efforts to maintain the Green Mountain lookout, working in collaboration
18 with the Forest Service. (*See, e.g.* AR 203-206, 246, 324, 330, 342, 351).[1] Despite these efforts,
19 by 1994, an assessment revealed serious deficiencies in structural components of the lookout –
20 including its catwalk, foundation, handrails, and roof – and recommended condemning the
21 lookout until the deficiencies were rectified. (AR 445.) Shortly thereafter, the Forest Service

22
23

24     [1] In 1990, the Forest Service entered into a "memorandum of understanding" with the
Friends of Green Mountain, memorializing their agreement that the Friends of Green Mountain
25 would "[d]evelop, for Forest Service approval, an annual plan for the work needed to assure the
preservation of the Lookout," "[p]rovide labor and materials needed for lookout preservation,"
26 and "[i]ncorporate minimum impact wilderness techniques into work plans and work activities."
(AR 268.)

1 condemned the lookout from public access, pending repair of the deficiencies on an "as-funded"
2 basis. (AR 497.)

3      In 1997, the Forest Service mailed a letter to a group of known "interested individuals
4 and groups" seeking input into the development of a plan to address the condition and future of
5 the Green Mountain lookout. (AR 550.) The letter identified two options under consideration:
6 repair, or condemn and remove. (AR 550.) Of the twenty-five responses received, most were in
7 support of preserving the lookout. (AR 758.) Subsequently, in March 1998, the Forest Service
8 mailed a letter to a list of "interested individuals and groups" inviting recipients to comment or
9 share concerns on a number of proposed projects in the Darrington Ranger District, including a
10 proposed project to restore the Green Mountain lookout. (AR 694-699.) This letter gave a seven-
11 line summary of the proposed restoration, mentioning the planned use of a helicopter to transport
12 materials and supplies. (AR 698.) No further comments were received. (AR 758.)

13      In May 1998, the Forest Service circulated internally a draft analysis of various courses
14 of action with respect to Green Mountain lookout, including (1) dissembling the lookout and
15 removing it from the wilderness, either by helicopter or by packstock; (2) relocating it to an area
16 outside of wilderness; (3) burning it down; (4) leaving it alone to naturally deteriorate; and (5)
17 stabilizing and repairing it, either with or without motorized equipment. (AR 722-739.) This
18 draft analysis was never made final or public, and the Forest Service did not solicit public
19 comment.

20      In September 1998, the Forest Service issued a decision memo detailing its decision to
21 repair the lookout, using a rock drill and a helicopter to transport supplies. (AR 756-757.) The
22 memo anticipated that about 25,000 pounds of material would be transported, resulting in about
23 8 helicopter trips. (AR 757.) In the memo, the Service stated that the special environmental
24 impact documentation required by NEPA was not required with respect to this decision since it
25 fell within a categorical exclusion, namely "repair and maintenance of recreation sites and
26 facilities." (AR 758.) The memo did not analyze other alternatives to dealing with the lookout,

1 | though it did assert, generally, that "[a] variety of alternatives were considered for this project,
2 | including no action and reconstruct[ion] . . . without the use of motorized equipment." (AR 759.)
3 | Pursuant to the Decision Memo, a contractor and volunteers invested hundreds of hours into
4 | repairing and stabilizing the lookout.

5 | Nevertheless, despite these efforts, by June 2002, the Forest Service discovered that the
6 | lookout's foundation had failed on account of heavy snowfall during the prior winter. (AR 1804.)
7 | Forest Service personnel noted the need to take further action urgently or risk losing the lookout
8 | entirely during the next winter. (AR 1804.) After internal discussion, the Forest Service decided
9 | to: disassemble the lookout piece by piece; remove it from Green Mountain by helicopter; repair
10 | and restore the pieces at a ranger station, salvaging original materials where possible; "repair"
11 | the foundation on the peak; and then fly the pieces back in for reassembly on top of the
12 | reconstructed foundation. (AR 1807-08, 1880-82.) In an internal planning document, entitled
13 | "Green Mountain Lookout Dismantle, Restoration and Reconstruction Plan 2002-2005," the
14 | Service noted that an objective of the restored structure would be to serve "as a point of visitor
15 | contact and interpretation of Forest Service and fire detection history." (AR 1880.) This
16 | document did not compare the proposed plan to any alternatives or otherwise analyze the
17 | necessity of the chosen course of action. The Forest Service did not solicit public comment on its
18 | plan.

19 | In or around August 2002, a few months after it had discovered the damage to the
20 | lookout's foundation, the Forest Service disassembled the lookout and removed the pieces by
21 | helicopter from the wilderness. (AR 1864, 1919, 1941.) Although the Forest Service apparently
22 | intended to lay a new foundation and return the lookout to its original location by the next
23 | summer, this did not happen for several years, due to funding and weather issues. (Dkt. No. 23-1
24 | at 14.)

25 | In 2009, seven years after the lookout was removed from its original location, the Forest
26 | Service hired the National Park Service to construct a new foundation for a lookout on Green

1  Mountain. (AR 2405-2411.) After the foundation was laid, most of the disassembled pieces of

2  the lookout – which had been restored or replaced off-site – were flown to the mountain and

3  reassembled on site. (Dkt. No. 23-1 at 14; AR 2451-2456.) According to Plaintiff, this work

4  involved at least 67 helicopter turns in wilderness, an assertion which the Forest Service does not

5  contest. (*See* Dkt. No. 37 at 6; *see also* AR 2405, 2443.)

6         Around this time, one of the members of Plaintiff Wilderness Watch became aware of the

7  Forest Service's actions with respect to Green Mountain lookout. This member initiated contact

8  with the Forest Service expressing concern about its actions. (AR 2459.) The Forest Service

9  subsequently exchanged a series of letters on the topic with the Wilderness Watch member, in

10  which the Service noted, among other things, that the Service planned to "staff the lookout with

11  volunteer interpreters who will provide an agency sponsored presence and point of contact to the

12  many visitors [expected to] come." (AR 2463.) In 2010, Plaintiff brought this suit, seeking a

13  declaratory judgment (that the Forest Service's actions violated the Wilderness Act and the

14  National Environmental Policy Act) and an injunction requiring removal of the lookout.

15  **II.    DISCUSSION**

16         **A.    Legal Standard**

17         The Administrative Procedure Act ("APA") governs judicial review of agency action and

18  permits courts to set aside agency action and findings when they are "arbitrary, capricious, an

19  abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although

20  the standard for review is "deferential," *River Runners for Wilderness v. Martin*, 593 F.3d 1064,

21  1070 (9th Cir. 2010), it requires that courts:

22         carefully review the record to ensure that agency decisions are founded on a
        reasoned evaluation of the relevant factors, and may not rubber-stamp
23         administrative decisions that they deem inconsistent with a statutory mandate or
        that frustrate the congressional policy underlying a statute. Nevertheless, [courts]
24         may not substitute [their] judgment for that of the agency.

25
        *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003) (citations, internal
26

1  quotation marks, and alterations omitted).

2      The parties agree that this case should be decided on summary judgment, as "there is no

3  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

4  law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

5      **B.    The Wilderness Act's Prohibition on Structures and the Use of Mechanized**
6           **Transport.**

7      By enacting the Wilderness Act of 1964, Congress sought "to assure that an increasing

8  population, accompanied by expanding settlement and growing mechanization, does not occupy

9  and modify all areas within the United States and its possessions, leaving no lands designated for

10  preservation and protection in their natural condition." 16 U.S.C. § 1131(a). "As President

11  Lyndon B. Johnson reportedly said upon signing of the Wilderness Act in 1964, '[i]f future

12  generations are to remember us with gratitude rather than contempt, we must leave them more

13  than the miracles of technology. We must leave them a glimpse of the world as it was in the

14  beginning, not just after we got through with it.'" *The Wilderness Soc'y v. U.S. Fish & Wildlife*

15  *Serv.*, 353 F.3d 1051, 1055 (9th Cir. 2003) (citation omitted).

16      The Wilderness Act defines "wilderness" as follows:

17      "A wilderness, in contrast with those areas where man and his own works
        dominate the landscape, is hereby recognized as an area where the earth and its
18      community of life are untrammeled by man, where man himself is a visitor who
        does not remain. An area of wilderness is further defined to mean in this chapter
19      an area of undeveloped Federal land retaining its primitive character and
        influence, without permanent improvements or human habitation, which is
20      protected and managed so as to preserve its natural condition and which

21      (1) generally appears to have been affected primarily by the forces of nature, with
        the imprint of man's work substantially unnoticeable;
22
        (2) has outstanding opportunities for solitude or a primitive and unconfined type
23      of recreation;

24      (3) has at least five thousand acres of land or is of sufficient size as to make
        practicable its preservation and use in an unimpaired condition; and
25
        (4) may also contain ecological, geological, or other features of scientific,
26      educational, scenic, or historical value.

1  16 U.S.C. § 1131(c).

2  The Act establishes guidelines for the management of the wilderness areas, providing

3  that:

4  [Wilderness areas] shall be administered for the use and enjoyment of the
   American people in such manner as will leave them unimpaired for future use and
5  enjoyment as wilderness, and so as to provide for the protection of these areas, the
   preservation of their wilderness character, and for the gathering and dissemination
6  of information regarding their use and enjoyment as wilderness.

7  *Id*. at 1131(a). Although the language is broad, Congress provided guidance as to the types of

8  things it considered likely to degrade the "wilderness character" of lands, providing that:

9   Except as specifically provided for in this chapter . . . there shall be *no*
    *commercial enterprise and no permanent road* within any wilderness area . . .
10  and, except as necessary to meet minimum requirements for the administration of
    the area for the purpose of his chapter, . . . there shall be *no temporary road, no*
11  *use of motor vehicles, motorized equipment or motorboats, no landing of aircraft,*
    *no other form of mechanical transport, and no structure or installation within any*
12  *[wilderness] area.*"

13  16 U.S.C. § 1133(c) (emphasis added).

14  **C.  Relationship Between the Wilderness Act and the NHPA**

15  Here, Plaintiff charges that the Forest Service violated several express prohibitions of the

16  Wilderness Act: (1) the bans on motorized equipment and aircraft (through its use of motorized

17  construction equipment and helicopters at the Green Mountain lookout site); and (2) the ban on

18  "structure[s] and installation[s]" (through what it describes as the creation of a new structure on

19  the top of Green Mountain). (Dkt. No. 19 at 7, 15). In response, the Forest Service asserts that its

20  actions to preserve the Green Mountain lookout were appropriate and justified in light of the

21  Wilderness Act's stated "devotion" to "historical use" of wilderness areas as well the Service's

22  responsibilities pursuant to the National Historic Preservation Act to preserve a nationally-

23  recognized historic property.

24  To resolve this dispute, the Court must first consider the interaction between the

25  Wilderness Act and the NHPA. The parties agree that both statutes apply, but disagree as to the

26  extent of the Forest Service's obligations under the NHPA. Plaintiff Wilderness Watch argues

1   that the NHPA is merely a procedural statute that "requires federal agencies, when undertaking

2   actions that may affect properties eligible for or included in the Historical Register, to take the

3   properties into consideration." (Dkt. No. 37 at 7 [citing 16 U.S.C. § 470f].). Thus, according to

4   Plaintiff, there is no basis for the claim that the Forest Service's duties under the NHPA justified

5   its actions with respect to the Green Mountain lookout. (Dkt. No. 37 at 8.) In contrast, the Forest

6   Service contends that Plaintiff's interpretation of the NHPA as purely procedural would result in

7   implied repeal of the NHPA since, in the Service's view, certain sections of the Act grant the

8   Service more than mere procedural responsibility with respect to preservation of historic

9   properties. (Dkt. No. 42 at 4). In this regard, the Forest Service argues that "NHPA provides

10   ample discretion to federal agencies to act affirmatively to protect [historic] properties on federal

11   lands under their jurisdiction . . . ." (Dkt. No. 42 at 5.)

12         Notably, unlike amicus curiae, the Forest Service shies away from arguing that the

13   NHPA creates substantive preservationist duties, adopting the more cautious position that the

14   NHPA *authorizes* affirmative action in furtherance of historical preservation. (Dkt. No. 42 at 5.)

15   However, in light of the Wilderness Act's clear proscription on the actions at issue here, the

16   Court considers that the NHPA has little impact on the outcome of this case unless it can be read

17   to *require* the Forest Service to act affirmatively to protect a historical structure. In other words,

18   the key question with respect to the NHPA is whether that legislation creates substantive

19   preservationist duties that must be balanced against the Wilderness Act's prohibitions on certain

20   activities.

21         In arguing that the NHPA is crucial to this case, the Forest Service points to the language

22   of § 110 of the NHPA, which provides, variously, that "the heads of all Federal agencies shall

23   assume responsibility for the preservation of historic properties which are owned or controlled

24   by such agency" (16 U.S.C. § 470h-2(a)(1)) and that properties listed on the National Register be

25   "managed and maintained in a way that considers the preservation of history, archaeological,

26   architectural and cultural values . . . and gives special consideration to the preservation of such

1 values" (16 U.S.C. § 470h-2(a)(2)(B)).

2 The Ninth Circuit has not had the occasion to address whether the language of § 110, in
3 particular, imposes substantive preservationist duties. The Ninth Circuit's NHPA jurisprudence
4 largely concerns federal agencies' obligations under § 106's consultation requirements. In this
5 context, the Ninth Circuit has repeatedly held that § 106 of the NHPA is procedural. *See, e.g.*,
6 *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citation
7 omitted) ("We have held that Section 106 of NHPA is a 'stop, look, and listen' provision that
8 requires each federal agency to consider the effects of its programs.").

9 While § 110 on its face appears more outcome-oriented than § 106, "[m]ost courts
10 discuss the obligations of Section 106 and the [NHPA] as a whole as if they were
11 interchangeable." *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 917 (D.D.C. 1996).
12 The few courts that have considered the nature of § 110 of the NHPA specifically have found
13 that § 110 should be read in conjunction with § 106. The D.C. Circuit, for example, considered
14 subsections of § 110 separately from § 106 and found that "the legislative history of § 110,
15 though scant, supports [the] reading of that section in conjunction with § 106." *Lee v.*
16 *Thornburgh*, 877 F.2d 1053, 1057 (D.C. Cir. 1989). The Court highlighted the fact that "when
17 Section 110 was added to the NHPA in 1980, Congress made clear that the new section 'is not
18 intended to change the preservation responsibilities of Federal agencies as required by any other
19 laws, executive orders or regulations.'" *Id.* Similarly, in *National Trust for Historic*
20 *Preservation*, the district court followed the D.C. Circuit's conclusion that § 110 must be read in
21 conjunction with the consultation provisions of § 106. 938 F. Supp. at 922. In so doing, the court
22 noted that § 110 "constantly refers" to § 106 and that § 106 "constitutes the main thrust of the
23 NHPA." *Id.* at 922, 925. The *National Trust* court summed up its analysis by stating that
24 "Section 110(a) cannot be read to create new substantive preservationist obligations separate and
25 apart from the overwhelmingly procedural thrust of the NHPA as described by every court that
26 has considered the Act." *Id.* at 922.

1    The Court finds this precedent persuasive and agrees that the NHPA does not compel
2  particular preservation-oriented outcomes. Accordingly, the Court rejects the notion that the Forest
3  Service had any affirmative obligation to preserve the Green Mountain lookout pursuant to §110 of
4  the NHPA that must be balanced against its obligations under the Wilderness Act. In fact, there is
5  no conflict between the Wilderness Act and the NHPA here since neither action nor inaction
6  toward the Green Mountain lookout would have placed the Forest Service in violation of the
7  NHPA, for the very reason that the NHPA itself that does not compel any particular outcome.

8    The conclusion that the Wilderness Act – and not the NHPA – controls this case is further
9  supported by the nature of the Wilderness Act. The Wilderness Act "emphasizes outcome
10 (wilderness preservation) over procedure" and has been described to be "as close to an outcome-
11 oriented piece of environmental legislation as exists." *High Sierra Hikers Ass'n v. U.S. Forest
12 Service*, 436 F.Supp.2d 1117, 1138 (E.D. Cal. 2006). Furthermore, the Wilderness Act specifically
13 establishes the preeminence of its requirements over other laws that may affect wilderness areas.
14 *See* 16 U.S.C. § 1133(b) (providing that the Service and other administering agencies are
15 "responsible for preserving the wilderness character" of a wilderness area and must administer it
16 "for such other purposes for which it may have been established as also to preserve its wilderness
17 character"). A district court in this Circuit recently considered the question of whether historic
18 dam structures in the Emigrant Wilderness could be repaired and maintained on the basis that they
19 were eligible for listing on the National Register of Historic Places. *High Sierra Hikers*, 436
20 F.Supp.2d at 1135. The court ruled that they could not because the Wilderness Act requires that the
21 preservation of wilderness values be prioritized over the maintenance of man-made historic
22 structures. *Id.* at 1136 ("Absent a declaration by Congress of the need to restore and preserve the
23 dam structures in recognition of their historical significance, there is nothing the court can point
24 to that would authorize such an action where the maintenance of the dams would otherwise come
25 into conflict with the Wilderness Act."). *See also Olympic Park Associates v. Mainella*, No. 04-
26 5732-FDB, 2005 WL 1871114 at * 8 (W.D. Wash. Aug. 1, 2005) ("[A]n agency utilizing its

1  authority under other laws in ways that affect the wilderness must do so pursuant to the

2  requirements of the Wilderness Act as a whole."); *Minnesota Public Interest Research Group v.*

3  *Butz*, 401 F. Supp. 1276, 1331 (D.Minn. 1975), *r'vsd on other grounds*, 541 F.2d 1292 (8th Cir.

4  1976) ("When there is a conflict between maintaining the primitive character of [a wilderness]

5  area and between any other use (including that of timber) the general policy of maintaining the

6  primitive character of the area must be supreme.").

7       **D.      Whether Historic Preservation Furthers the Goals of the Wilderness Act**

8       Having concluded that there is no conflict between the NHPA and the Wilderness Act

9  and that the provisions of the Wilderness Act control this case, the Court will now proceed to

10 examine the question of whether the Defendants violated the Wilderness Act through their

11 actions with respect to the Green Mountain lookout.

12                    **1.    Forest Service's Interpretation of the Wilderness Act**

13      The Court first assesses the level of deference due the Forest Service's determination that

14 historic preservation of Green Mountain lookout furthers the goals of the Wilderness Act. The

15 Forest Service has interpreted its actions toward Green Mountain lookout and the lookout's

16 continuing presence as "fully consistent with the express purposes for which the wilderness area

17 was created" because the lookout is both "a historical use and a historic structure." (Dkt. No. 42

18 at 8.) In support of their position, Defendants point to certain sections of the 1964 Wilderness

19 Act and the 1984 Washington State Wilderness Act, which purportedly establish historical

20 preservation as a valid purpose of the wilderness. (*Id.* at 8-9.) The Wilderness Act, for example,

21 provides in part that "wilderness areas shall be devoted to the public purposes of recreational,

22 scenic, scientific, educational, conservation, and *historical use*. 16 U.S.C. § 1133(b) (emphasis

23 added). In turn, the Washington State Wilderness Act provides that "[t]he purposes of this Act

24 are to . . . designate certain National Forest System lands in the State of Washington as

25 components of the National Wilderness Preservation System, in order to promote, perpetuate,

26 and preserve the wilderness character of the lands [and] . . . *preserve* scenic and *historic*

1    *resources . . . .*" Pub. L. 98-339, §2(b)(1) (emphasis added).

2      Defendants' interpretation of the Wilderness Act must be given deference by this Court

3 unless it is unambiguously contrary to the language of the Act, in which case no deference is

4 owed. *Wilderness Watch v. U.S. Fish and Wildlife*, 629 F.3d 1024, 1032 (9th Cir. 2010). The

5 Ninth Circuit has not considered the question of whether historical preservation is a valid

6 purpose of the Wilderness Act. However, other courts that have considered this issue –

7 including one in the Western District of Washington – have concluded that historical

8 preservation, at least with respect to man-made structures, is not a valid purpose of the

9 Wilderness Act.

10      For example, in *Wilderness Watch v. Mainella*, a case involving the use of motor vehicles

11 to transport tourists across a wilderness area in order to provide access to historic sites, the

12 Eleventh Circuit rejected the National Park Service's argument that the reference to "historical

13 use" in the Wilderness Act establishes the preservation of historical structures as a goal of the

14 Wilderness Act. 375 F.3d 1085, 1091 (11th Cir. 2004). The Eleventh Circuit noted that the

15 mention of "historical use" in Section 4(c) came at the end of a list that also referred to

16 "recreational, scenic, scientific, educational, [and] conservation" uses. *Id.* at 1092. On the

17 Circuit's reading, this list related back to the prior definition of wilderness areas in Section 2(c),

18 which describes "an area of undeveloped Federal land retaining its primeval character and

19 influence, without permanent improvements or human habitation" that "may also contain

20 ecological, geological, or other features of scientific, educational, scenic, or historical value." *Id.*

21 The Circuit concluded that "given the consistent evocation [in the Wilderness Act] of

22 'untrammeled' and 'natural' areas, the previous pairing of 'historical' with 'ecological' and

23 'geological' features, and the explicit prohibition on structures, the *only reasonable reading* of

24 'historical use' in the Wilderness Act refers to natural, rather than man-made, features." *Id.*

25 (emphasis added).

26      The Eleventh Circuit's reasoning on this issue was cited approvingly by this District in

1 *Olympic Park Associates v. Mainella,* a 2005 case involving the question of whether the National
2 Park Service violated the Wilderness Act when it decided to replace two collapsed trail structures
3 in the Olympic Wilderness. 2005 WL 1871114 at * 1. The Park Service had built replica
4 structures outside of the wilderness, and planned to airlift them into the wilderness with
5 helicopters. *Id.* The Park Service argued that its decision was justified because replacing the
6 shelters would advance the "purposes of cultural resource protection" in wilderness, and because
7 the shelters were eligible for listing on the National Register for Historic Places. *Id.* at ** 5-6. In
8 rejecting these rationales, this court found "persuasive" the Eleventh Circuit's holding in
9 *Wilderness Watch v. Mainella*, and rejected the Park Service's argument that placing a man-
10 made structure in wilderness advanced "cultural resource protection," stating that:

> While the former structures may have been found to have met the requirements
> for historic preservation, that conclusion is one that is applied to a man-made
> shelter in the context of their original construction and use in the Olympic
> National Park. Once the Olympic Wilderness was designated, a different
> perspective on the land is required. Regarding the Olympic Wilderness, that
> perspective means 'land retaining its primitive character and influence, without
> permanent improvements or human habitation, which is protected and managed
> so as to preserve its natural conditions.'

*Id.* at *6 (citing 16 U.S.C. § 1131(c)).

17 Like the *Olympic Park* court, this Court finds the Eleventh Circuit's reading of the
18 Wilderness Act compelling. However, the Court must also take into account available Ninth
19 Circuit precedent, which, while not directly on point, is instructive. As mentioned above, the
20 Ninth Circuit has not directly considered the question of whether the Wilderness Act provides
21 unambiguous direction to the Service with respect to historical preservation. However, in a
22 recent case, *Wilderness Watch v. U.S. Fish and Wildlife Service*, the Circuit considered a related
23 question – the question of "the purpose of the Wilderness Act with respect to conservation." 629
24 F.3d 1024 at 1033. In examining the issue, the Ninth Circuit referenced a seeming inconsistency
25 within the Wilderness Act, namely that it provides that "wilderness areas shall be *devoted* to the
26 public purposes of recreational, scenic, scientific, educational, *conservation*, and historical use" –

1  thereby implying room for conservation activities on wilderness land – but also requires agencies

2  to manage the land so as "to preserve its natural conditions . . . with the imprint of man's work

3  substantially unnoticeable" – which suggests that human interference in wilderness lands is to be

4  avoided. In light of this apparent tension, the Ninth Circuit concluded that it could not "discern

5  an unambiguous instruction to the Service" since the agency was "charged with simultaneously

6  devoting the land to 'conservation' and protecting and preserving the wilderness in its natural

7  condition." *Id.* Accordingly, the Court accorded deference to the agency's interpretation of the

8  term "conservation."[2] 629 F.3d at 1035.

9      The Court notes that the reasoning employed in *Wilderness Watch v. U.S. Fish and*

10  *Wildlife* could just as easily be applied here. In particular, to the extent that the reference to

11  "conservation" in the list set out in Section 4(b) creates an instruction that conflicts with an

12  agency's obligation to preserve the area's "wilderness character," the reference to "historical

13  use" in that same list would logically create the same conflict. Indeed, the Ninth Circuit's

14  discussion, while focused on the term "conservation," seems to suggest this broader application

15  as it refers to conflicting instructions arising out of the Section 4(b) list of additional uses, one of

16  which is "historical" use. *See Wilderness Watch*, 629 F.3d at 1034 (stating that the Wilderness

17  Act sets out "conflicting instructions" since the administering agency "must preserve the

18  wilderness character of the area while at the same time providing for 'recreational, scenic,

19

20

---

21      [2] In a prior case, *High Sierra Hikers Association v. Blackwell*, the Ninth Circuit was
called upon to assess the level of deference "due to the Forest Service's determination that
22  preserving the wilderness character of [wilderness areas] is not the ultimate interest of the
Wilderness Act." 390 F.3d 630, 647 (9th Cir. 2004). The Court made note of its own view that
23  "Congress intended to enshrine the long-term preservation of wilderness areas as the ultimate
goal of the Act." *Id.* However, presumably recognizing its duty not to substitute its own
24  judgment for that of the agency, the Court ultimately concluded that "the diverse, and sometimes
conflicting list of responsibilities imposed on administering agencies renders Congress's intent
25  arguably ambiguous," and that therefore deference was due to the agency's determination. *Id.* at
26  647-648.

1  scientific, educational, conservation, and historical use'"). Furthermore, the Ninth Circuit's

2  discussion does not indicate that there is anything exceptional about "conservation" such that it

3  creates a greater conflict with the overarching obligation to preserve the area's wilderness

4  character than is created by other uses mentioned in Section 4(b). Indeed, one might imagine

5  that agency action furthering the goals of conservation would be *less* likely to conflict with the

6  overriding goal of wilderness preservation than action furthering other referenced uses. For

7  example, actions taken in furtherance of conservation are more likely to be fully consistent with

8  restoring the "natural condition" of wilderness areas and erasing the "imprint of man's work"

9  than actions taken to further "recreational use," given that actions taken in furtherance of the

10  latter use would almost certainly encourage increased human presence in wilderness areas.

11       Thus, applying the logic of the Ninth Circuit in *Wilderness Watch v. U.S. Fish and*

12  *Wildlife*, the Court finds that in light of the ambiguity arising out of the Wilderness Act's

13  reference to various uses, deference is due to the Forest Service's interpretation that historical

14  use is a valid goal of the Act. Nevertheless, the Court's analysis does not end here. The Court

15  must go on to determine if the actions of the Forest Service with respect to the lookout were

16  "necessary" to meet the "minimum requirements" for administration of the area for the purpose

17  of historical use.

18       **E.    Whether the Forest Service's Actions were "Necessary" to Meet "Minimum Requirements"**

19

20       As discussed above, the Wilderness Act sets out prohibitions on structures or installations

and the use of motorized equipment and landing of aircraft. These prohibitions may be bypassed

21  only "as necessary to meet minimum requirements for the administration of the area." 16 U.S.C.

22  § 1133(c).[3] Because the Court has deferred to the Forest Service's conclusion that historical

23

24       [3] There is no dispute that the lookout is not now used for emergency purposes, such as

25  detecting forest fires or spotting enemy aircraft. Similarly, there is no dispute about the fact that Congress has not exempted Green Mountain lookout from the requirements of the Wilderness Act, as

26  it has done for the Appalachian Trail and its related structures and the Evergreen Mountain Lookout in Washington.

1 preservation furthers the goals of the Wilderness Act, the relevant question here is whether the

2 presence of the Green Mountain lookout and the use of motorized equipment and helicopters to

3 rehabilitate the lookout were "necessary" to meet the "minimum requirements" for

4 administration of the area for the purpose of preserving a historic use. The Court pays "respect"

5 to the agency's determination on this issue, but does not afford it heightened *Chevron* deference

6 since the Forest Service was not acting in the exercise of its authority to promulgate rules

7 carrying the force of law. *See Wilderness Soc'y*, 353 F.3d at 1067.

8　　　　In its briefing, the Forest Service focuses on the question of whether the Wilderness Act

9 requires the removal of historic structures from wilderness areas. (*See, e.g.* Dkt. No. 42 at 8, 10.)

10 In the Court's view, this is not the key question. This case does not require the Court to decide

11 whether the Green Mountain lookout should have been removed or destroyed after it became

12 fully encompassed within a wilderness area in 1984. The essential question at this point is

13 whether the 2002 decision to engage in extensive rehabilitation and reconstruction of the lookout

14 and the related use of mechanized transport was "necessary" for the "minimum administration"

15 of the area for historical use.

16　　　　In order to properly invoke an exception to prohibited conduct in a wilderness area, an

17 agency must make an adequately reasoned finding of necessity. *See Wilderness Watch,* 629 F.3d

18 at 1037. A "generic finding of necessity does not suffice." *Id.* Here, the Forest Service has not

19 identified any documentation where the Service engaged in a reasoned analysis of the necessity

20 of dismantling, removing, and reconstructing the lookout.

21　　　　This is not an instance where the Forest Service had no other alternative that would be

22 consistent with furthering the purposes of "historic use" of the lookout. Indeed, the Forest

23 Service has applied alternative approaches with respect to other lookouts with historic value. For

24 example, the Service has relocated several fire lookouts in Wenatchee National Forest from their

25 original perch in the mountains to an interpretive center located at an accessible spot along a

26 well-traveled highway. (*See* Dkt. No. 37-1.) Similarly, in 2005, the Forest Service chose to allow

1 a lookout in the Norse Creek Wilderness to deteriorate but sought to preserve its historic value
2 by setting up an exhibit at a popular non-wilderness trailhead that accesses the wilderness area.
3 (*See* Dkt. No. 37-2.)

4       The Forest Service seeks to emphasize the heavy involvement of the public in
5 maintaining the lookout over the years, and recounts in detail the number of hours of volunteer
6 labor expended in the effort to preserve the lookout. The Court can appreciate the need for the
7 Forest Service to take account of the enthusiasm and industriousness of the Friends of Green
8 Mountain as well as others committed to the preservation of the lookout. However, the Forest
9 Service's principal responsibility is to the preservation of the wilderness, as wilderness.
10 Furthermore, the nature of the Forest Service's initial decision to allow the lookout to remain in
11 the wilderness area and to be periodically maintained, principally by community groups, is
12 entirely different than the nature of the Forest Service's 2002 decision to fully disassemble the
13 lookout, transport the pieces off-site by helicopter, construct a new foundation on site, fly new
14 and restored lookout pieces back in to the site, and reassemble the lookout. The Forest Service
15 erred egregiously by not conducting the required necessity analysis before embarking on such an
16 aggressive course of action.

17       It may be suggested that the Forest Service's 2002 decision can be justified pursuant to
18 the Forest Service's 1998 decision memo outlining its plan to repair Green Mountain lookout.
19 However, that decision memo also failed to conduct a necessity analysis to justify why its (less
20 aggressive but still substantial) repair plans with respect to the lookout, which included the use of
21 motorized equipment and transport, were "no more than was necessary to achieve the goals of
22 the [Wilderness] Act." *See Wilderness Watch*, 629 F.3d at 1036. Indeed, in 2009, after looking
23 back at the decision memo, at least one senior Forest Service manager concluded that nothing in
24 the document satisfactorily justified the maintenance of the structure. (*See* AR 2548 (the Forest
25 Service regional program manager for wilderness stated that nothing in the materials she had
26 reviewed, which included the 1998 decision memo, "show[ed] any credible need to maintain

1  [Green Mountain lookout] as the minimum required for the administration of the wilderness").)

2      After thorough consideration of the record, the Court has come to the conclusion that the
3  Forest Service's 2002 decision failed to take proper account of the mandates of the Wilderness
4  Act. The parties dispute whether the "reassembled" Green Mountain lookout is a revamped
5  structure or is, by this point, a "new" structure. Regardless, it is clear that the Forest Service
6  went to extraordinary lengths to protect a man-made structure from the natural erosive effects of
7  time and weather. The Forest Service went too far. Clearly, there are less extreme measures that
8  could have been adopted, such as relocation of the lookout outside the wilderness area, which
9  would have had less impact on the "wilderness character" of the area but still furthered the goal
10  of historical preservation. Indeed, after the damage done by the 2001-2002 winter weather, even
11  the head of the previous lookout restoration efforts recommended that the Forest Service
12  "[a]irlift the building to a site near the Darrington Ranger Station and utilize it as an interpretive
13  station highlighting the fire, wilderness, and general Forest Service history of the area." (AR
14  555.)

15      The extensive use of helicopters to carry out the Forest Service's reconstruction plan is
16  also concerning. As other courts have observed, machinery as intrusive as a helicopter is rarely
17  "necessary to meet minimum requirements for the administration of the area" since
18  "[h]elicopters carry 'man and his works' and so are antithetical to a wilderness experience." *Wolf*
19  *Recovery Foundation v. U.S. Forest Service*, 692 F.Supp.2d 1264, 1268 (D. Idaho 2010). In *Wolf*
20  *Recovery*, the district court found that the proposed helicopter use in a wilderness area was
21  appropriate, but noted that the situation was "very unique," since the helicopters were being used
22  to restore an aspect of the "wilderness character" of the area which had been destroyed by man.
23  *Id.* (approving the Forest Service's use of helicopters to restore wolves to a wilderness area
24  where "[i]t was man who wiped out the wolf from the area [and] now man is attempting to
25  restore the wilderness character of the area by returning the wolf"). In contrast, here, the Forest
26  Service made frequent use of helicopters not to promote wilderness values but rather to further

1   what the Service understands to be a separate purpose of the Wilderness Act, i.e., historic
2   preservation.

3       **F.    National Environmental Policy Act**

4       In addition to finding that the Forest Service violated the substantive provisions of the
5   Wilderness Act, the Court further finds that the Forest Service violated the NEPA's procedural
6   requirements. NEPA requires agencies to carry out systematic analysis of proposed actions to
7   ensure that they take a "hard look" at the environmental consequences of those actions. *Metcalf*
8   *v. Daly*, 214 F.3d 1135, 1141 (9th Cir. 2000). The public nature of NEPA analysis also ensures
9   that the public is kept informed of action that may have significant environmental consequences.
10  *See Kern v. Bureau of Land Management*, 284 F.3d 1062, 1066 (9th Cir. 2000). Generally, an
11  agency must prepare an environmental impact statement ("EIS") (assessing the positive and
12  negative environmental consequences of a proposed action and considering alternatives) or an
13  environmental assessment ("EA") (assessing whether a significant impact on the environment is
14  likely) before committing resources to an action. *California v. Norton*, 311 F.3d 1162, 1168 (9th
15  Cir. 2002). However, an agency may avoid the EIS or EA requirements under NEPA if the
16  proposed action meets the criteria for a categorical exclusion, i.e., falls into a "category of
17  actions which do not individually or cumulatively have a significant impact on the environment."
18  40 C.F.R. ¶ 1508.4.

19      In its 1998 Decision Memo authorizing repair of the lookout, the Forest Service claimed
20  a categorical exclusion from NEPA's analysis requirements, on the basis that repair of the
21  lookout fell into the category of "repair and maintenance of recreation sites and facilities."
22  However, even if the Forest Service's adoption of a categorical exclusion at that point was
23  proper, and there is evidence to suggest it was not, the Forest Service should have reassessed the
24  issue in 2002 before engaging in its more elaborate rehabilitative initiative. The 1998 Decision
25  Memo authorizes "repairs" to the lookout; it does not authorize or address what the Service did
26  in 2002 and onward under the rubric of a new "dismantle, restoration, and reconstruction" plan.

1    Considering that the "repair and maintenance of recreation sites and facilities" categorical

2    exclusion is typically intended for more minor projects associated with ordinary maintenance –

3    such as "applying registered herbicides to control poison ivy on infested sites in a campground"

4    or "repaving a parking lot"[4] – and considering that the proposed project involved a specially

5    protected area, the Court finds that the Service abused its discretion by not conducting an EIS or

6    EA – or, at a minimum, by not readdressing the issue of whether a category exclusion was

7    applicable – before embarking on its dismantle, restoration, and reconstruction plan.

8          **G.    Injunctive Relief**

9          Having determined that the Forest Service's actions with respect to Green Mountain

10   lookout were unreasonable and violated the Wilderness Act and NEPA, the Court must now

11   consider the proper remedy. Plaintiff Wilderness Watch argues that the only adequate remedy in

12   this case is an injunction requiring the Forest Service to remove Green Mountain lookout from

13   the Glacier Peak Wilderness. (Dkt. No. 19 at 23.) In reply, Defendants assert that Wilderness

14   Watch has failed to meet its burden of proof for obtaining an injunction, particularly with respect

15   to the required showing that the public interest not be disserved by a permanent injunction. (Dkt.

16   No. 23-1 at 33-36.)

17         A district court has "broad latitude in fashioning equitable relief when necessary to

18   remedy an established wrong." *Natural Res. Def. Council v. Southwest Marine, Inc.,* 236 F.3d

19   985, 999 (9th Cir. 2000). In order to obtain a permanent injunction, a four-factor test must be

20   satisfied. *Monsanto Co. v. Geertson Seed Farms,* __ U.S. __, 130 S.Ct. 2743, 2756 (2010). "A

21   plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies

22   available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

23   that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

24   is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

25

26
          [4] *See* Code of Federal Regulations, 36 C.F.R. § 220.6(d)(5).

1  *Id.*

2      The record here establishes that the presence of the Green Mountain lookout

3  detrimentally impacts on the wilderness character of the Glacier Peak Wilderness. The Court is

4  satisfied that encountering such a structure in the wilderness area has harmed the interests of

5  Plaintiff's members and is harmful generally to the interests of those seeking to experience the

6  primeval character, solitude, and natural conditions associated with wilderness. This is

7  particularly true in light of the fact that the lookout is visible from various parts of the Glacier

8  Peak Wilderness. (AR 725.) The Court also takes note of the fact that the continued presence of

9  the lookout invites increased traffic into an area of the wilderness which is already subject to

10  overuse due to its proximity to the fast-growing Puget Sound population base. (*See* AR 722

11  (stating that the trail to Green Mountain lookout is a very popular day hike); Dkt. No. 19-1

12  (indicating that as far back as 1990, the Forest Service recognized that Glacier Peak Wilderness

13  was over capacity, that Green Mountain was subject to overuse, and that "use continues to grow

14  with the increasing population of the Puget Sound area"); AR 757 (indicating that, as of 1998,

15  Green Mountain trail was receiving 1,200 visitors annually from June to September and stating

16  that "[a]s the population in the Puget Sound Region continues to grow, the number of visitors to

17  Green Mountain is expected to increase as well").)

18      The harm done and the harm anticipated by the continued presence of the lookout cannot

19  be adequately addressed through the provision of money damages. Indeed, as the U.S. Supreme

20  Court has recognized, "[e]nvironmental injury, by its nature, can seldom be adequately remedied

21  by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco*

22  *Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987). In any case, money damages are not

23  available in this case since the Court's power to review the Forest Service's actions arises out of

24  the Administrative Procedure Act, which does not authorize money damages. *See, e.g. Donnelly*

25  *v. United States*, 850 F.2d 1313, 1318 (9th Cir. 1988).

26      As for the balance of equities factor, the Court finds that an injunction would not impose

1  an undue hardship upon the Forest Service. The lookout structure was removed in its entirety in
2  2002, and the Forest Service has offered no evidence that it could not be removed again. The
3  historic value of the lookout could be retained through other means. such as relocating the
4  lookout to a ranger station or providing a history of the lookout in a nearby station, as the Forest
5  Service has done with other fire lookouts.

6  Finally, with respect to the requirement that the public interest not be disserved by an
7  injunction, the Court has considered the Forest Service's claims that "there is a considerable and
8  concrete public interest in preserving the chapter of Washington history that the Green Mountain
9  lookout represents." (Dkt. No. 23-1 at 35.) Nevertheless, as Plaintiff points out, the crux of the
10  issue is how to define "the public interest," a concept about which reasonable people frequently
11  disagree. (Dkt. No. 37 at 23.) Ultimately, the Court agrees with Plaintiff that the public interest
12  here is best identified by reference to the underlying substantive policy reflected in the statute at
13  issue, the Wilderness Act, and that the overarching purpose of the Wilderness Act weighs in
14  favor of maintaining the "wilderness character" of the area. *See Owner Operator Independent*
15  *Drivers Ass'n, Inc. v. Swift Transp. Co.*, 367 F.3d 1108, 1112 (9th Cir. 2004) ("Once Congress
16  has the order of priorities in a given area . . . it is merely for the courts to enforce them when
17  enforcement is sought.") (internal quotation marks omitted); *High Sierra Hikers Ass'n*, 390 F.3d
18  at 643 (stating that the Wilderness Act reflects a "strong public interest in maintaining pristine
19  wild areas unimpaired by man for future use and enjoyment"). Congress could have provided an
20  exception for Green Mountain lookout, as it has done with respect to other historical structures
21  located in wilderness areas. It did not.

22  Thus, as detailed above, the Court is satisfied that Plaintiff Wilderness Watch has met the
23  four-part test for obtaining injunctive relief. Accordingly, the Court finds that removal of the
24  present lookout structure is the appropriate remedy for the Forest Service's violations of the

25

26

1  Wilderness Act and NEPA.[5]

2  **III.    CONCLUSION**

3         For the foregoing reasons, the Court hereby GRANTS Plaintiff's motion for summary

4  judgment and injunctive relief (Dkt. No. 19) and DENIES Defendants' motion for summary

5  judgment (Dkt. No. 23). This cause of action is DISMISSED and the Clerk of the Court is

6  directed to enter judgment for Plaintiff.

7         DATED this  day of March 2012.

8

9

10

11                                                        John C. Coughenour
                                                          UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17

18

19

20

21  _____

22      [5] Although not briefed by the parties, the Court has considered alternative equitable
    remedies, in particular the possibility of barring further repairs such that the reconstructed
23  lookout deteriorates naturally. However, this solution would not adequately remedy the prior or
    future harm done as the reconstructed lookout would remain in conflict with the wilderness
24  character of the area and would continue to attract traffic, thereby contributing to the overuse and
    environmental degradation of the Glacier Peak Wilderness area. Furthermore, while the former
25  lookout was highly subject to natural deterioration due to its relatively primitive materials and
    exposed location, in light of the major foundation work done in the last round of rehabilitation
26  and reconstruction efforts, it appears that the present lookout structure has been built to last.